### F. A. EFFINGER, Guardian &c. et al. *v.* J. C. RICHARDS, Administrator.

1. EXECUTOR AND ADMINISTRATOR: EXCEPTION TO RULE THAT PARTIAL SETTLEMENT IS CONCLUSIVE AGAINST ACCOUNTANT.—As a general rule, a partial or annual settlement of an administrator or executor, is conclusive as against the accountant, but this rule does not apply to an error against the accountant arising from mere oversight, mistake, or miscalculation, if the error be clearly established, and if it be shown that no possible injury can arise to the adverse party from its correction.

2. SAME: CASE IN JUDGMENT.—Where a partial settlement was made jointly by two co-administrators, and a debt due to the intestate by one of them, who was a distributee of the estate, was therein charged to the accountants as having been received by them, it is competent for the other, upon a final

settlement of his accounts, to exonerate himself from liability therefor, by showing that the money was not in fact paid, but that the charge was made in pursuance of an agreement between him and his co-administrator, that it was to operate as a credit on the distributive share of the latter.

3. CONTRACT: CONTEMPORANEOUS WRITTEN INSTRUMENTS CONSTRUED TOGETHER. —A written agreement between the maker and payee indorsed on a promissory note, to the effect that the note, though payable on its face, on demand, was not to be payable until the happening of a future event, is to be construed as if incorporated in the note and a part of it; and hence the note will not become due and payable until the event mentioned in the indorsement transpires, and the Statute of Limitations will commence running only from that time.

4. INTEREST: RATE ON LOANED MONEY UNDER ACT OF 1842.—By the 3d section of the Act of the 14th February, 1822 (Hutch. Dig. p. 643, Art. 6), the rate of interest on *bona fide* contracts for loaned money, is fixed at eight per cent. per annum, where there is no agreement between the parties as to the rate of interest to be charged.

5. EXECUTORS AND ADMINISTRATORS: RULE IN RELATION TO COSTS IN CASES NOT DEFENDED.—The statute which provides, that the representative of decedents shall not be allowed costs for the prosecution or defence of suits in their trust capacity, unless upon the certificate of the court wherein the suit was determined, that there was a probable cause for such prosecution or defence, does not apply to a case where such representative was sued, and a judgment rendered against him, on a debt due by the decedent, and to which he made no defence. In such a case the administrator or executor will be entitled to an allowance of the costs, if it appear that he was not in default, owing to a deficiency of assets, or his inability to convert them into money to pay the debt. *Aliter* where there is no excuse for his failure to pay.

6. HIGH COURT: PROBATE COURT: JUDGMENT OF THE LATTER PRESUMED CORRECT.—A decree of the Probate Court, upon a matter within its jurisdiction, is presumed to be correct, unless the evidence contained in the record show affirmatively to the contrary.

7. EXECUTORS AND ADMINISTRATORS: COMMISSIONS.—Where administration was granted to two jointly, and one of them died, it was held that upon a final settlement made by the representative of the deceased administrator of his account, the court might allow commissions for the services of the decedent, without at that time making any allowance to the survivor.

APPEAL from the Court of Probates of Madison county. Hon. I. M. Simmons, judge.

Henry R. Coulter (the appellee's intestate), and Ann M. Henderson (now Effinger), administered jointly on the estate of George

W. Henderson. After Coulter's death, his administrator, Richards, presented a final account of Coulter's administration of said estate.

To this account, F. A. Effinger, guardian of the only child and heir of Henderson, filed several exceptions. Those which were overruled, and assigned for error in this court are as follow:—

3d. That the accountant has not charged himself with, but claimed credit for, $6000, which Coulter had reported in his last annual account, as collected from Mrs. Effinger for the sale of Henderson's one-third interest in the Artesian Springs.

4th. Objection was made to the allowance of voucher No. 160, because it was barred by the Statute of Limitations.

5th. If voucher No. 160 is not barred, then it is objected that the interest paid, viz., eight per cent., was too high, only six per cent. being allowable.

6th. Voucher No. 162 is objected to, the same being for $64 32, paid for costs in suits against the administrator in the Circuit Court, there being no certificate of probable ground of defence, as required by law.

7th. Is an exception to the payment of eight per cent. interest on a debt due by intestate, instead of six per cent. and credit therefore allowed on Voucher No. 185.

In support of the 3d exception, Effinger read in evidence, from an annual account which purported to have been rendered jointly by himself, as administrator in right of his wife, and by her and Coulter, administratrix and administrator of said Henderson, in December, 1853, the following entry as a charge against the accountants, viz.: "For this amount received from Mrs. A. M. Henderson for sale of George W. Henderson's one-third interest in the Artesian Springs, $6000." And he showed that said account was in the handwriting of Coulter, and sworn to by him, but was not signed, or sworn to, by Effinger and wife.

It was then admitted that Coulter and Mrs. Henderson, as administrator and administratrix of George W. Henderson, had filed their bill in the Superior Court of Chancery against M. Jones and H. Latham, who, with said G. W. Henderson, were the joint owners of the Artesian Springs, and had procured an order to sell the same for division: that a sale was made, and Mrs. Henderson became the purchaser at $18,000, and executed her three several

bonds, payable to the commissioner in chancery, with security to secure the payment of her bid.

Effinger then read in evidence an instrument under seal, signed by M. Jones, H. Latham, and Coulter, as administrator of G. W. Henderson, and filed by them in the Chancery Clerk's Office, dated 24th March, 1853, in which they acknowledged "payment and satisfaction in full of said bonds," and directed the clerk to enter satisfaction of them; which was done.

Richards then proved that nothing in fact had been paid to Coulter by Mrs. Henderson, but that it was agreed between her and Coulter, that she should account to him for the same on final settlement of the estate. Effinger objected to any evidence being introduced by Richards, to explain the item of $6000 charged in the account of 1853.

Voucher No. 160, to which the fourth and fifth exceptions apply, was as follows:—

CANTON, January 17th, 1845.

$1521$\frac{61}{100}$. Due Jesse Heard, fifteen hundred and twenty-one $\frac{61}{100}$ dollars, for loaned money, for value received.

MOTZ & HENDERSON.

"It is agreed by and between us, the subscribers, that as Jesse Heard has furnished the money to pay a judgment of *S. M. Catchings* v. *Heard & Livingston*, administrators of J. T. Dearing and ourselves, that he shall have what the said claim may bring, when a dividend on said estate shall be declared; and then the balance due said Heard, on the above note, will be paid by us, and said Heard is to hold said note until said dividend is declared.

"MOTZ & HENDERSON,<br>"JESSE HEARD.

"January 17th, 1845."

This voucher was regularly probated, and was finally paid by Coulter, on the 28th December, 1854.

It was proven, that the dividend on Dearing's estate was declared on the 11th May, 1853, and that the judgment mentioned in the foregoing agreement, as paid by Heard, bore eight per cent. interest.

It was admitted that Coulter had paid eight per cent. interest on this voucher.

Voucher No. 185, to which the seventh exception applies, is a due-bill, regularly probated, made by Henderson, and payable to Coulter, as guardian; and expresses, on its face, to be for loaned money. Interest on this, at eight per cent., was paid, and the exception was that only six per cent. was allowable.

Voucher No. 162, to which the sixth exception applies, is the receipt of the circuit clerk and sheriff of Madison county, for fees and costs due them, on certain judgments rendered against Coulter, as administrator. And it was insisted by Effinger, that the credit was improper, as there was no certificate of the Circuit Court of probable grounds for defending the suits.

It was shown, in support of the voucher, that the several judgments were rendered by default, and that at the time the suits were instituted, and the judgments rendered, that the administrator and administratrix had no cash on hand belonging to said estate, but that the cash received had been paid out as soon as collected.

The bill of exceptions recites, that "it was also proven, that previous to the death of Henry R. Coulter, in the year 1855, the sum of $2988 57, was placed by Coulter in the hands of A. G. Lancaster & Co., to the credit of the estate of George W. Henderson, deceased, and was there on deposit at his death, and that the same was paid over after his death to Richards, the administrator of Coulter, and that the same was in no way accounted for by Richards."

The bill of exceptions also recites, that "the inventories and sale-bills of the assets of George W. Henderson's estate, were read in evidence; and that it was admitted, that all the assets mentioned therein, were accounted for either in the annual settlements of Coulter, or the final account of Richards, then under consideration.

The court overruled all the above exceptions, and refused to charge Coulter with the amount deposited with Lancaster & Co., and allowed Coulter commissions for administering the estate.

From this decree, Effinger, as guardian, and Effinger and wife, as administrator and administratrix, took separate appeals.

*F. Smith,* for appellants.

I. Can an administrator be heard to falsify his own sworn account? It is settled by this court that he cannot. *Garrett* v. *Singleton et al.* 1 Cushm. 198; *Brown et al.* v. *Hill*, 5 Ib. 51, 52; *Lee* v. *Gardner*, 4 Ib. 548; *Quine* v. *Quine et al.* 9 S. & M. 160, 161, 165, 166.

II. Any act, either a judgment or specialty, which at the party's motion is entered, or procured to be done, though others may contest, he cannot. Authorities last cited, and *Kibble et al.* v. *Butler*, 5 Cushm. 587, 588; Chitty's Blackstone, 2d Vol., 18th London Ed., published in New York, 1836, note (36) to top page 381, 382; Co. Litt. 369, a; *Hardeman* v. *Cowen*, 10 S. & M. 486; *Benson et al.* v. *Stewart*, 1 George, 58, 59; *Adams* v. *Guice*, 1 Ib. 407.

III. The allowance of the annual account by the Probate Court, December term, 1853, was a judgment, and must stand, however erroneous, unless got clear of by some recognized mode. *Ragland* v. *Green et al.* 14 S. & M. 199, 201; 6 Cushm. 413, 529; *Battle* v. *Wolf*, 1 Ib. 318, 319.

1. It cannot be reformed, except between the original parties; and cannot be changed so as to affect the rights of third persons. *Sims & Brothers* v. *Talbot*, 5 Cushm. 488, 492; *Kilpatrick* v. *Kilpatrick et al.* 1 Ib. 128, 129.

2. Even equity cannot relieve a party from an act deliberately done, unless he can charge that fraud was committed on him, or that the charge be clearly made and proved, of mistake, and this can be between the original parties only. *Burns* v. *Yeizer et al.* 5 Cushm. 193, 194; 1 Ib. 128.

It is not pretended that Mr. Coulter was circumvented by fraud, to state under oath that he had received the $6000; nor is it stated in the petition of Richards, that the item was put into his account by mistake; but only a flat contradiction is relied on: " He does honestly believe from information, that the said sum of $6000 was never received by him, nor paid by said Amanda M. Henderson." Mr. Coulter swears it was received, and paid; his administrator swears he believes it never was.

There is neither a charge of fraud or mistake, but a bold contradiction of Mr. Coulter's oath, by his friend and representative; although the oath was deliberately taken in a judicial proceeding, and lay before him on the records some two or three years before

his death, and made with all the safeguards of verity, not the least of which is, being against his interest.

IV. The negative unsatisfactory proof corresponds to the negative set up against Mr. Coulter's oath.

From the record, the court will perceive that there was much feeling in this matter. Dr. Henderson, the witness relied on, was a man of strong prejudices and passions, and pursued his interests with steady aim, and, like all such men, liable to forgetfulness and bias. He swore that he acted as Mrs. Henderson's agent up to her marriage. It is evident, from the sworn statements of Dr. and Mrs. Effinger, in answer to Richards's bill of discovery, that he was not regarded by Effinger as a friend to his wife, nor by Mrs. Henderson, now Mrs. Effinger, was he in any manner, nor on any occasion, regarded by her as her agent.

Dr. Henderson swears, that no note was executed by Mrs. Henderson for her bid on the Artesian Springs. On the record, the notes are set out, executed in April, 1852, with the evidence indisputable on the face of the notes, that Dr. Henderson knew the fact personally.

This palpable self-contradiction, on a well-recognized principle, disposes of the witness's whole testimony.

Besides, other facts in Dr. Henderson's answer, as deposed to by him, could not in the nature of things, have been within his knowledge; and the rule in such cases is well established, that, "if the defendant assert a fact which is not and cannot be within his own knowledge, the nature of his testimony cannot be changed by the positiveness of his assertion." 3d Condensed U. S. Rep. 319, 320, 325, 326; *Parker et al.* v. *Bacon et al.* 4 Cushm. Reps. 425.

V. In upholding the judicial records of the country, especially where they are the only assurances of the rights of minors and orphans, the Court of Appeals cannot err, in holding the judicial admissions in their favor as sacred, whatever the consequences may be in the particular case. For, no hope can there be for widows or orphans, or for anybody else, if vague and uncertain parol evidence can be produced by a party as it may suit his interest, against his own sworn solemn admissions.

1. Mr. Coulter's annual account contains a statement, "certain to every intent;" that which is now attempted, is vague parol proof,

in " plain contradiction" to that which he solemnly and deliberately asserted as true. Such a case falls directly under the condemnation of a rule, which has been held to for ages, for the safety of society. 1 Greenleaf's Evidence, 2d Ed. §§ 22, 27, 186.

·2. There is not only the sworn statement that the money had been paid and received from Mrs. Henderson, but solemnly, in the Chancery Court, the notes are marked satisfied and paid in full.

The ward of Effinger, the infant, has a right to rely on this amount, as the funds of the estate, whatever may be said.

3. This court has, in innumerable instances, acted on the rule of law which holds this position to be unanswerable. Many of these decisions have been quoted above.

The reason of the rule is of great antiquity, because coeval with the good sense and experience of mankind.

" No man ought to allege anything but the truth for his defence ; and what he has ·alleged once, is to be presumed true, and, therefore, he ought not to contradict it ; for, as it is said, in the 4 Inst. 272, *allegans contraria non est audiendus.* Secondly. As the law cannot be known until the facts are ascertained, so neither can the truth of them be found out, but by evidence ; and, therefore, it is reasonable that some evidence should be allowed to be of so high and conclusive a nature, as to admit of no contradictory proof." Co. Litt. note 1 to 352 a.

It is better that not only six thousand dollars should be lost, but six times six, than that a whole people should have their property and estates subject to the varying winds of parol proof (against oaths and records), and the forgetfulness and facility in changing facts, produced by passion, prejudice, or interested cupidity.

The court of last resort will not stoop from its high estate, to lend its aid to make records " as false as dicers' oaths," nor stop to inquire who has " the better right," in such a case, should it even be doubtful ; but will see that " the fountains· of justice are preserved pure," by leaning to the side of the safety of the people. *Lowry* v. *Bourdieu,* Douglass, 470.

Nothing done by Mr. Coulter, after December, 1853, nor by his administrator, changed the case, as he then made it. His account of 1853, was then, as to him and the estate he represented, his final account ; and, unless some evidence can be shown that he was

defrauded, or fell into error,—something done in the estate, changing the state of things as he left them, in December, 1853,—the account in 1853, was on principle, his final account, so far as that item is concerned; and to make it otherwise, the proof must be produced, that it was by matter subsequent, altered, changed, modified, or withdrawn, and the voucher shown, where, how, and when.

*Davis* and *Hill*, on same side.

*H. A. H. Lawson*, for appellees,

Cited 2 S. & M. 514; 1 Greenl. Ev. §§ 212, 305; Chilton Probate Law and Pr. 332; 9 Pick. 27; 1 Ib. 160.

SMITH, C. J., delivered the opinion of the court.

The appellee, as the legal representative of Henry R. Coulter, deceased, presented the account of his intestate, as one of the administrators of the estate of George W. Henderson, deceased, for settlement and allowance, in the Court of Probates of Madison county. The account was contested by the appellant, Francis A. Effinger, as guardian of the infant daughter and sole heir-at-law of said Henderson, and by Mrs. Effinger, as distributee and co-administratrix of the estate. They took various exceptions to the account, and, upon its allowance, as adjusted and restated, they prosecuted separate appeals.

The error, principally relied on for a reversal of the decree, is, that the court refused to charge the appellee with the proceeds of the sale of certain real property, which, it is alleged, was received by his intestate.

It appears, from the record, that administration of the estate of said Henderson was granted, jointly, to his widow, Mrs. A. M. Henderson, and the said Coulter; that Mrs. Henderson afterward intermarried with the appellant, F. A. Effinger; and that Coulter died before the estate was settled up—in fact, that but one account, not intended to be a final, but only a partial, settlement of the estate, was ever presented. That account was rendered in December, 1853, after the marriage of Mrs. Henderson with the appellant, Effinger; and purports to be the joint account of said Effinger

and wife, and the said Coulter, as the administrator and administratrix of the deceased's estate.

The account thus made out, contained a list or inventory of assets, belonging to the intestate's estate, consisting of claims due upon open account, drafts, &c., and of money received from persons indebted to the estate, which had come into the possession of the administrators after the return of the inventory. Among the assets thus reported, was the sum of six thousand dollars, stated to have been received from Mrs. A. M. Henderson (one of the accountants), for the sale of the one-third interest of George W. Henderson, deceased, in the Artesian Springs.

It was insisted that this particular sum, should be charged as a debit against the appellee, in the settlement of his intestate's account, as administrator of Henderson's estate; and the refusal of the court to do so, is the subject of the exception above alluded to.

In the account, this sum is entered as a charge against the administrators. The question, therefore, raised by the exception, involves a consideration of the character, and of the effect to be given to the annual, or partial, settlements of the estates of deceased persons, made by their executors or administrators.

These settlements are never made upon notice to the parties, creditors, and distributees, interested in the decedent's estate. The order, therefore, entered in a proceeding of this character, is neither final nor conclusive, in regard to them; it amounts to only *prima facie* evidence of the correctness of the account. Hence, upon an application for a final settlement of an administration account, the creditors and distributees have a right to object to any previous settlement; and, upon exceptions filed, pointing out the errors, to have the whole account corrected, according to the truth.

But this right has not been given, by law, to the executor or administrator; and for that reason, it is insisted, that the order made, in the allowance of the annual accounts of executors and administrators, is final and conclusive, as to them.

Manifest reasons require the recognition of this principle, as the general rule; but the reasons are equally manifest, why it should not be held to apply, with undeviating strictness, in all cases, and under all circumstances.

The object of all law is the dispensation of strict justice be-

tween the parties who invoke its assistance. And, to that end, the forms of procedure in courts, and the principles of evidence, have been moulded and established. In the administration of the estates of deceased persons, the legal representative acts in the capacity of an officer of the Court of Probates. The acts of the executor or administrator, in a certain sense, are the acts of the court. Whenever sanctioned, they are, unquestionably, so far as the rights of all parties are concerned, to be regarded as its acts. Hence, whenever, by an order of the court, manifest injustice would be done to any party to the proceeding, if such order is held an adjudication of the subject, conclusive upon all parties, reason and justice require that such an effect should not be given to it. For example, when an inaccuracy in a partial settlement prejudicial to the executor or administrator, arising from sheer inadvertence or oversight, or from palpable mistake or miscalculation, no principle of justice or sound policy requires, that he should be bound by the order allowing the account, or estopped by the account itself. But while these exceptions to the general rule, applicable to the accounts of executors and administrators, are recognized, no correction should be allowed, except in cases in which the error, alleged to have arisen from oversight, mistake, or miscalculation, is clearly established, and under circumstances where no possible injury could result to the adverse parties.

But in this case the contest is not so much whether the administrator, by a correction of the account, shall be exonerated from a charge therein admitted to exist in favor of the estate; as it is a controversy between the representative of a deceased administrator and the surviving administratrix, as to which of the two shall be charged. For it by no means follows, that if the appellee should not be held accountable for the money arising from the sale of the Artesian Springs, that the appellant, Mrs. Effinger, would likewise be discharged. The rule, therefore, above laid down is not strictly applicable to the question under consideration.

The ground on which the decree, in this respect is sustained is, that the evidence before the court showed, clearly and conclusively, that the appellee's intestate never received any part of the proceeds of the sale of the Artesian Springs. In fact, that Mrs.

Effinger, who bought that property, which was sold pursuant to a decree of the Superior Court of Chancery, never paid a cent of the purchase-money. And that the annual account, in which the administrators charge themselves with the proceeds of the sale, was made out pursuant to an agreement between Mrs. Effinger, who, as the widow of George W. Henderson, deceased, was entitled to distribution on his estate, and the appellee's intestate, that the former should be charged with the amount of those proceeds upon the final distribution of the estate.

In our opinion, the evidence fully justifies this position. If, therefore, the decree should be reversed, and the appellee be held accountable for the proceeds of the sale of the Artesian Springs, great and manifest injustice would be done. The appellee would be compelled to pay for the property bought by Mrs. Effinger; and she would, so far as the estate is concerned, be discharged from the payment of a large sum of money, which, upon every principle of equity and justice, she still owes.

The account was rendered jointly by all of the administrators; and, as the decree here can have no effect whatever upon the liability of the survivors, we cannot perceive in what possible way the parties interested in the succession can be injured. Hence, in view of all of the circumstances, we think that the decree in this respect is not erroneous.

The next error complained of, is the allowance for the amount of principal and interest, paid by the appellee's intestate, on a note made by said Henderson.

The objection is based upon the grounds, first, that the claim was barred by the Statute of Limitations, and, therefore, the administrator was not justified in paying it; and, secondly, admitting the debt to be a valid claim against the estate, the note bore interest at the rate of six per cent., and not eight as allowed by the court.

The note in question was in form a due-bill, bearing date the 7th of January, 1845. The consideration expressed upon the face of it was loaned money. There was an agreement appended to or indorsed upon it, and signed by the payee and makers in these words: " It is agreed by and us, the subscribers, that, as Jesse Heard (the payee) has furnished the money to pay a judgment of

S. M. Catchings v. Heard and Livingston, administrators of the estate of J. T. Dearing and ourselves, in the Madison Circuit Court, that he shall have what the said claim may bring when a dividend on the said estate is declared on said claim, and then the balance due said Heard on the above note will be paid; and said Heard is to hold said note until said dividend is declared."

According to the well-settled rule on the subject, the note and this agreement, constituted one instrument. In law the agreement was as much a part of the note, as if its terms had been inserted in the body of the note itself. And, regarding the note and the indorsed agreement as one instrument, it is impossible to doubt as to its true construction. Manifestly, the money was not to be paid until a dividend was declared on Dearing's estate.

The dividend was declared on Dearing's estate May the 11th, 1853. The statute did not commence to run until that time; and, as the money due on the note was paid before the December following, there was no color for the assumption that the claim was barred.

The second branch of the exception is equally without foundation.

The rate of interest which the note bore was fixed by the Statute of the 14th of February, 1842. The second section of that act fixed the rate of interest in this State on all contracts, except *bona fide* contracts for the loan of money. And the third section is in these words: " The rate of interest hereafter on *bona fide* contracts for loaned money, shall be eight per centum per annum." .

This language is too plain to receive any aid from construction, as to what was the intention of the legislature. Unquestionably, it was not its purpose to fix a limit, for the conventional interest which might be agreed on by the parties, in contracts for the loan of money, but to provide that contracts of that character should bear interest, at a certain rate, which would, under the operation of the statute, attach as an incident to the contract. Hence, it is not to be controverted, that a *bona fide* contract for loaned money, would bear interest at the rate of eight per cent. per annum, although it contained no stipulation in regard to interest.

In the settlement of the account, an allowance was made for the

costs in three suits brought against the administrator, and in which no defence was made; and this is assigned for error.

In regard to suits prosecuted or defended by the representatives of deceased persons, the statute has provided that no allowance for the costs shall be made in their favor, unless the suits were prosecuted or defended on probable grounds; and that fact must be proved by the certificate of the court in which the cases were tried. But no provision is made for the case here presented; and it is left to be determined by the general principles which apply in the settlement of administration accounts.

If the executor or administrator were in default, and had thereby occasioned the costs, propriety and justice require that he should have no allowance for them. As, for example, where the executor or administrator, having ample funds of the estate in his hands, permits suit to be brought upon a claim, duly authenticated, and not disputed, he should be personally chargeable with the costs of the suit, although he interposed no defence.

On the other hand, if by reason of the deficiency or condition of the assets, or from any sufficient cause, it was rendered impossible, by payment of the demand, to prevent the institution of suit, it is clear that the executor or administrator should be allowed for the costs.

No facts are stated in the record, from which the inference can be drawn, that the administrator, in this respect, was in default. Indeed, no such ground is taken, in support of the exception, which is sustained, solely, on the ground of the non-production of the certificate of the court in which the suits were tried, that there were probable grounds for defending them. Hence, applying the principles above stated, as there is nothing to show that the action of the court was erroneous, we are bound, by a rule of universal application, to hold it correct.

It appears, that a sum of money ($2988.57), was placed with A. G. Lancaster & Co., to the credit of the estate of said Henderson, in 1855, by the appellee's intestate, and that, after his death, it was delivered over to the appellee; and it was contended, at the settlement of the account, that this sum should be accounted for, as money belonging to Henderson's estate. The court ordered otherwise; and this is also assigned for error.

The facts above stated, constitute the only evidence in regard to the ownership of the money; and, giving it the utmost effect to which it can be entitled, it amounts to very feeble proof that the money belonged to Henderson's estate. The court held, that it did not; and we are bound to presume that, from an examination of the inventory, and the account of sales returned by the administrators, and the account rendered in 1853, neither of which is before us, it satisfactorily appeared, that the estate of the appellee's intestate, should not be held accountable for the money.

Upon the settlement of the account, the sum of $3388.20, was allowed as commissions, to the appellee's intestate,—being three per cent. upon the amount of the estate.

The exception to the decree, in this respect, is not that the amount allowed as commissions was exorbitant, but that the commissions should have been divided between Mrs. Effinger and the appellee's intestate.

A sufficient answer to this objection is, that Mrs. Effinger was not before the court for an allowance of commissions, upon either a partial or final settlement of her accounts. When she presents her accounts for settlement, and asks for an allowance of commissions, it will become the duty of the court, to award her such an amount as will be a fair compensation for her services, rendered in administering the estate.

This is the last objection; and, having found no error in the proceedings, we order the decree to be affirmed.