SUSAN J. MCFARLANE, BY HER NEXT FRIEND, *v.* JAMES G. RANDLE.

1. EVIDENCE: ADMISSIBILITY OF PAROL TO EXPLAIN OR CONTRADICT WRITTEN INSTRUMENTS.—Written instruments, including records, cannot be contradicted or explained by parol testimony.

2. GUARDIAN AND WARD: CONCLUSIVENESS OF FINAL AND ANNUAL ACCOUNTS: CANNOT CONTRADICT BY PAROL.—Where the final or annual account of a guardian states the balance against him in dollars and cents, he cannot impeach or contradict it by proof that the balance stated was money collected in the depreciated issues of broken or suspended banks, or in Confederate money, or that the same was at the time invested in Confederate bonds. *Bailey* v. *Dilworth*, 10 S. & M. 404.

3. SAME: ANNUAL ACCOUNTS MAY BE CORRECTED IN CASES OF MISTAKE AND INADVERTENCE.—The annual accounts of guardians are final and conclusive against them in the court where rendered, and can only be set aside by due course of procedure. Inaccuracies in such accounts arising from sheer inadvertence or oversight, or from palpable mistake or miscalculation, may, in proper cases, be corrected. 33 Miss. 553; 35 ib. 540; *Crump* v. *Geroch*, 40 ib.

4. SAME: SAME.—Where a guardian in his annual accounts has repeatedly stated the balance due his ward in dollars and cents, he will not be permitted to show by parol testimony that such balances were in Confederate treasury notes or in Confederate bonds, and especially after the circumstances of the country had wholly changed, and the Confederate notes and bonds had become entirely worthless.

5. PROBATE COURT: PRACTICE: EXCEPTIONS TO ACCOUNTS.—It is the duty of the Probate Court to cause an account to be restated by a commissioner or otherwise, where exceptions to the same have been sustained and a correction decreed with which the guardian does not comply.

APPEAL from the Probate Court of Monroe county. Hon. Thomas H. Davis, judge.

The facts of the case are stated in the opinion of the court.

*Sale & Phelan* for appellants.

The point made below, that the guardian had exceeded the annual income of his wards, was decided in favor of the wards.

I. The first question to be discussed here, is the guardian's conversion of the entire estate of his wards into Confederate government bonds or stocks.

1. When claims devolving upon or coming to the hands of the guardian, in the regular discharge of his duties, are already, or without any fault of his own, become bad or doubtful, he might, in good faith, receive payment of them in depreciated currency, if that were the best he could do; but not in case of voluntary investments by him, or notes or bonds taken by him without authority of law. Even in the first case, "it is his duty to convert the same into something less perishable as soon as possible." *Bailey* v. *Dilworth*, 10 S. & M., 404. A more stringent rule is adopted in *Hughes* v. *Smith*, 2 Dana's Ky. Rep., 252; 1 Barb. & Har. Eq. Dig., 590, § 37. It is the guardian's fault if he retain depreciated funds in his hands indefinitely.

The vast lore on the subject of "bailments," "measure of diligence," "gross neglect," etc., invoked by counsel below, only applies to those acts *which he is by law authorized to perform.* It is only in such cases that the guardian is required to exercise such care and diligence " as a prudent man uses in his own affairs."

But even *this* test would inevitably be fatal to Randle. He did *not* use the same care in good faith for his wards as for himself. He only invested *his* surplus means, reserving 2000 acres of land, lately worth $120,000, 180 slaves, stock, etc., his full plantation and outfits, and his fine town residence. But he recklessly converted the entire fortune of his wards, consisting of money, a small portion of which would have been sufficient for their support, into Confederate bonds, then worth only twenty for one in specie, and depreciating daily; thus making these girls insurers of the success of the war, to the extent of their entire estate ! "All the estate" means the same to both guardian and wards, though one was very rich and the others

McFarlane *v.* Randle.

very poor, and the same law applies to both. So we see the doctrine of diligence invoked by the guardian would slay him. But it does not apply. The question is simply one of authority *vel non*, as we will show.

The loans testified of by Randle were individual and unauthorized transactions, without authority of Probate Court as required by law, Rev. Code, art. 147, p. 462, and the case of *Bailey* v. *Dilworth* does not apply. The wards might accept or reject, as in case of unauthorized purchases of land or slaves. *Gully* v. *Dunlap*, 24 Miss. 410. A guardian may not speculate with his ward's means; and if in so doing he loses, the loss is *his* alone.

But admit these loans were lawful, his own testimony shows the parties were all good until they became bankrupt by the result of the war. He surely was not, therefore, justified in collecting them, in 1862, in depreciated Confederate States treasury notes, and afterwards, instead of "speedily converting them into something less perishable, actually, in 1864, investing them in Confederate States government stocks !

The guardian is required to get authority from the Probate Court to lend. Rev. Code, art. 147 on page 462 ; *Reynolds* v. *Walker*, 29 Miss. 265, 266, and on pages 267, 268. And not having received such authority, his lending was a private transaction, with which the wards cannot be complicated. He is presumed to have in hand the money charged to him in his previous account, and it is presumed in law it was these *par funds* which he invested in Confederate States stocks.

2. Was such purchase of stocks lawful and binding on the wards? In Hutch. Code, page 678, a guardian is allowed with the approbation of the Probate Court to invest his ward's surplus in land or slaves. Any investments without such approbation was illegal, and not binding on the ward. *Davis* v. *Harris*, 3 S. & M. 9 ; *Gully* v. *Dunlap*, 24 Miss., on page 411 ; 2 Kent, 229, 230. In the present Code there is no provision for even *so much*.

The only question is as to the *power* of making the investment, and if that be wanting, the question of "diligence,"

"prudence," etc., cannot possibly apply. *Smyth* v. *Burns*, 25 Miss. 422; *Hughes* v. *Smith*, 2 Dana's Rep. 252, in Barb. & Har. Eq. Dig. 590, § 37.

Nothwithstanding the argument of counsel below to the contrary, we assert that Confederate States stocks are not "*currency*" any more than railroad or canal stocks.

But counsel think they find the power for the guardian to act as he has done, in the "War Act" of August 2, 1861, which allows guardians, etc., to invest money of their wards, etc., in Confederate States treasury notes.

But this act was for the avowed purpose of contributing to the support of what has been solemnly decided to be rebellion and treason against the United States government. It is therefore inherently void. 1st, as contrary to *public policy;* 2d, as contrary to § 10 of art. 1 and § 3 of art. 3 of the constitution of the United States; and 3d, as annulled by the Mississippi constitutional convention of 1865. Pamphlet, pages 39, 40, 41. The act of Dec. 20, 1865, acts 1865, pages 141 *et seq.*, does not revive this "War Act." 1st, because, it being void for reasons above stated, it is incapable of ratification; and 2d, because the 4th section of said act of Dec. 20, 1865, is void as impairing the obligation of contracts. Const. U. S., § 10, art. 1; Miss. Bill of Rights, 19th section in Const. of 1865. At the date of this act (of Dec. 20, 1865) Randle owed each of his wards $8,000 in coin. If the act be valid he owes them *nothing!*

But, even admitting its validity, it does not apply to Randle's case. He did not "receive" any "Confederate States treasury notes," "in due course of business," but *purchased* Confederate States government "*stocks*" without authority.

But, for argument's sake, admit the law to be valid, and to apply to Randle's case. Still we contend that by formally reporting under oath, in his annual accounts of 1862, 1863, and 1864, the balances in his hands as "money" and "dollars," and by their being so denominated in Randle's petition to retain without interest, and in the various orders and decrees of the court, Randle is estopped from contradicting the abundant

record he has made. *Bailey* v. *Dilworth, ut supra ;* also *Tiffany* v. *Johnston et al.*, 27 Miss. 227. A guardian's account confirmed by the proper court is *final* until reversed by an appellate court. *Johnson* v. *Miller*, 33 Miss. 553. The ward may afterwards, by bill of review, surcharge and falsify his guardian's account. Hutch. Code, 728, § 3 ; but as to the guardian it is final. The exception to the rule hinted at in *Effinger* v. *Richards* is acknowledged by the judges to be " *obiter dictum,*" and will not overturn the long train of decisions to the contrary. But even the exceptions do not apply here, for they are stated to be cases of " mistake," " miscalculation," and the like, and Randle does not pretend to have made any such. The truth is, there is *no* exception to the rule that the guardian's account properly confirmed is final and conclusive. If Confederate States stocks were now at a large premium the wards could not recover the profits of the speculation. Shall he then be held to be a sufferer by the loss?

If the records and decrees of the Probate Court are worth anything, Randle cannot now be permitted to ignore the whole, undo and unsay all he has ever done and said, and by a stroke of a pen convert $8,000 of lawful money into *nothing !* leaving his wards penniless while he retains the bulk of his large estate. And yet he, standing in " *loco parentis,*" asks the " Orphans' Court " to beggar these girls on the ground that he managed their affairs with the same care and prudence as he did his own ! !

II. As to the guardian's competence as a witness for himself. We contend that art. 190 Rev. Code, page 510, is restricted to Circuit Courts of Law and Equity. Being an innovation on the common law and being found alone in the Circuit Court act, there is nothing which will extend it to any other court. Even then it is enacted that no one shall be a witness for himself to establish his claim against the estate of a deceased person to an amount exceeding $50. And it is to be presumed the legislature while guarding the estates of deceased persons sedulously, did not mean to surrender the entire estates of helpless minors to the power of the *ex parte* testimony of the guardian.

Randle's case is an apt illustration of the reason of the rule we contend for, and his testimony ought to have been excluded.

III. The correctness of the 7th assignment of error is apparent. The Probate Court, while charging the guardian with about $3,000, in each case, excess over income, renders no definitive decree thereon requiring a restatement and correction of the account, but merely sustains the exceptions to that part of the account, and nothing further.

*Houston and Reynolds* for appellee.

1. As to the guardian exceeding the income of his wards.

If during the *whole guardianship* the guardian preserve the the original estate, the fact that in any one or more particular years he exceeded the income is not that "excess" forbidden by law. The statute uses the plural, "accounts," "expenditures," signifying that by "excess" is meant any diminution of the *original estate* during the entire guardianship. Rev. Code, page 461, § 147. The guardian cannot, without authority, encroach upon the capital. *Austin* v. *Lamar,* 23 Miss. 192. Capital, we take it, means the *original sum,* and not additions to it of interest over and above expenditures from year to year. In *Frelick* v. *Turner* (26 Miss. 394) the guardian had reduced the original sum in the course of ten years. The court caused him to make good only the original sum. "The guardian shall not exceed the income of his ward's *estate.*" Rev. Code, 461, § 147. An estate in lands is that which descends to an heir; in movables, which descends to the administrator. Webster's Dict. "*estate,*" No. 4.; Bouvier's Law Dict. "*estate.*" Now *rents* and *profits* or *interest* do not descend to the heir or representative, but are the mere incidents of that which *does* so descend.

Again, there are exceptions to the general rule forbidding excess of income (*Frelick* v. *Turner, ut supra*), and the court will presume, from the allowance of the 8th annual account, that it was an exception until the contrary be shown, it being always presumed the guardian acted legally.

Again, it is not shown there was no previous order to exceed

income. This proceeding as to all the annual accounts, except the 11th, being in the nature of a bill of review, everything is presumed in favor of the judgment of the court, and unless the exceptor makes a showing to the contrary, the accounts will be sustained.

2. The same principles apply to the 2d exception.

3. They also apply to the 3d, and we may show in addition, that the record shows the guardian obtained leave from the court to hold the ward's money until he could loan it, on account of the impossibility of loaning it out at that time. As the ward had to be supported during that time, this was equivalent to authority to exceed their income.

4. As to the collection of the ward's estate by the guardian in Confederate States bonds, etc.

"A guardian is bound to use such prudence and caution in the management of his ward's estate as a careful man would use in his own affairs. He may compound debts, etc., and will be upheld in so doing, if he appear to have acted in good faith." *Berry* v. *Parkes*, 3 S. & M. 639; *Baily* v. *Dilworth*, 10 S. & M. 409; *Boggan* v. *Walton*, 12 S. & M. 668-9; *Smyth* v. *Burns*, 25 Miss. 427; 2 Lomax Exrs., marg. 230, § 12; *Kee's Exrs.* v. *Kee's Creditors*, 2 Gratt. Va. Rep. 116; *Elliott* v. *Carter*, 9 Gratt. 557; *Brown* v. *Campbell*, 1 Hopkins' N. Y. Chancery Rep. 233; *Thompson* v. *Brown*, 4 Johns. Chancery Rep. 619, 629; 5 Humph. Tenn. Rep. 524; 4 Dessaussure S. C. Chancery Rep. 207; *Harvard College* v. *Emory*, 9 Pick. 461; *Lovell* v. *Meriott*, 20 Pick. 119; ib. 120; 2 Wheat. U. S. Rep. 42; *Jackson* v. *Jackson*, 1 Atkins' English Rep. 514; 3 Pier. Williams, 381; 1 Camp. & Mees. 402; 3 Atkins, 480.

Randle, as guardian, is *trustee* for his wards. Toller Exrs., page 80, note B; page 133, note C; 1 Gill & Johns. 270, 274; Ambler, 219; 5 Vesey, 843; Maddox Ch. 114; *Henderson* v. *Winchester*, 31 Miss. 291; *Davis* v. *Cheevers*, ib. 32; *Davison* v. *Davison*, 33 Miss. 560; *Manly* v. *Kidd*, ib. 41.

*Gratuitous bailees* are only responsible for "gross negligence." We admit, however, that guardians being allowed compensation in this State, are bailees for hire, and are respon-

27

sible for ordinary neglect. Story Bail. § 23, page 429 ; Jones
Bail. § 10, page 119 ; *Coggs* v. *Bernard*, 2 Lord Raymond,
909 ; Pothier Oblg. 23. " Ordinary diligence is that degree
of diligence which men exert in their own affairs." ' Story Bail.
§. 11, pp. 14, 15. It is that care which men of common pru-
dence, capable of governing a family, take of their own con-
cerns. Jones Bail. 6 ; 14 Serg. & Rawle, 575 ; 3 Bing. N. C.
465. May be different in different ages and countries, and
controlled by circumstances. Story Bail. §§ 11, 12, 13 ; 3
Bing. N. C. 465, ut supra ; 4 Barn. & Ald. 21, 30. Now, if
it appear that Randle, in receiving payment of debts due his
wards, in Confederate States money, and in converting it into
Confederate States bonds, did what prudent men in the country,
at the same time, did in regard to their own debts, he will be
held to have exercised the necessary ordinary diligence required
to protect him. And the testimony on that point is fully deci-
sive and satisfactory. He received the Confederate States
*money* in 1862, and invested it in Confederate States bonds, in
1864, and at the same time invested $83,000 of his own money
in said notes and bonds. The most prudent and skilful men in
the country were doing the same at that time. Even the State
invested her surplus funds in these bonds, and encouraged the
counties and all trustees to do the same. Acts, July & August,
1861, page 39 ; pp. 73, 74 ; Acts, April 5, 1864, p. 31 ; March
30, 1864 ; August, 13, 1864, pp. 29, 30.

The Confederate States Congress, then holding power over
the State, discriminated, in taxing, in favor of those receiving
Confederate States money for debts. There was no tax on
treasury notes or bonds.

The enemy were at that time constantly trying to destroy
the property of the debtors to the wards, and render them in-
solvent. The chances at the time were supposed to be in favor
of the final success of the Southern arms, in which event these
bonds would have been at a premium, and the best of investments.

The State legislature authorized guardians, executors, &c., to
invest in said notes or bonds. Act August 2, 1861, pp. 38, 39.
This act was confirmed and ratified by the act Dec. 20, 1865.

McFarlane *v.* Randle.

But it is contended that these acts are unconstitutional, as authorizing the receipt of money due the ward in anything but gold and silver, thus impairing the obligation of contracts. But the guardian is allowed to compromise doubtful claims; and if he may thus release part, may he not be allowed to receive something of value, except legal tender. *Baily* v. *Dilworth*, ut supra.

Again : if a guardian by authority from a Court of Chancery could purchase lands and slaves with his ward's means, Rev. Code, 464, which the ward was obliged to receive on coming of age, why might not the legislature constitutionally give to the guardian, or even *the ward*, power to invest without special authority ?   29 Miss. 186 ; 3 S. & M. 744–5 ; 30 Miss. 247 ; 16 Mass. 328–9 : 2 Peters, 627 ; 16 Peters, 26.   Or the legislature might itself have directed such investments as in some of the cases cited.   This *was* done by act August 2, 1861, and all proceedings under that act were ratified and confirmed by act of Dec. 20, 1865.   The legislature, as common guardian of all minors, may prescribe the duties and powers of the special guardians, and may afterwards ratify their acts.   16 Mass. 328, 333.

The United States constitution forbids any State from making laws impairing the obligation of contracts, or making anything but specie a legal tender for debts ; but the States have certainly the power as general guardian of all minors to promote their interests by allowing debts to be compromised, and their property changed into something else.   16 Mass. 328, ut supra.   The guardian is not the debtor of his ward properly speaking, but his *bailee*, and his liability is to the *State* on his bond.   His obligation to his ward is to faithfully and honestly perform his duties, and he is not always bound to make his acts result beneficially, for if he acts honestly and faithfully he is discharged from liability though he may lose his ward's entire estate.   So Randle, having acted honestly and prudently towards his wards, is exonerated, though the result to the wards may be disastrous.

The general rule, that the orders of the Probate Court allowing annual accounts are conclusive on the guardian, has an

exception in cases of "inaccuracies," "mistakes" or "miscalcu-lations." *Effinger* v. *Richards*, 35 Miss. 550, and on pp. 542, 543. Nor is this rule reversed in *Cobb* v. *Leak*, 31 Miss. 133; *Henderson* v. *Winchester*, ib. 29; 1 Greenl. Ev. §§ 206, 210, 212; 9 Pick. 26, 27, 28, 29; 1 ib. 157–9; 1 B. & Pull. 49; *Doe* v. *Tyburn*, 7 Tenn.; 13 Ala. 329; Chilton's Probate Court Law, 332, § 3; 6 Halst. N. J. Rep. 40; *Crump* v. *Gerrick, opinion book.* " *Gildart's heirs* v. *Starkey,*" 1 How. 451, does not militate against this position, for that was a final account that was sought to be set aside in another tribunal *collaterally*, while this is but one of many *annual* accounts, a *mistake* in which is asked to be corrected. The distinction is wide and clear. Again in *Griffin* v. *Vestal et ux.* it is said that for mistakes in annual accounts there is a plain and easy remedy at law. What other remedy exists at law than correction by the Probate Court?

But it is contended that Randle having loaned his ward's money without authority, he is presumed to have yet in hand the money thus illegally loaned. But we think it is clear the guardian may lend his ward's money without an order of court. Rev. Code, page 462, § 147, says : " The Probate Court *may direct,*" not " shall empower" or words to that effect, leaving us to infer that the guardian has already the power, and that in case of his failure to act, the court might direct him to do so. The case is different from investing ward's funds in land, slaves; then he must get authority from the Probate Court. This is of much more importance to the ward, and hence the greater caution required. By the present Code, the bonds taken by the guardian for ward's money loaned is not required to be approved by the court, as in Hutch. Code; thus showing the intention of the legislature in changing the law. The point in question in *Walker* v. *Reynolds*, 29 Miss. 262, *et seq.*, is not the one now under consideration, and we are not bound to regard any extra-judicial opinions in said case not connected directly with the question at issue.

Lastly, if Randle, as insisted, be presumed to have in hand the money illegally loaned, then he certainly had that money at the date of the act of August 2, 1861, authorizing him to

McFarlane *v.* Randle.

invest in Confederate States bonds without an order of court. He did so invest the money of his wards *then in his hands*, under authority of law, and, thus acting in justice and good faith, ought not to be held responsible for loss.

ELLETT, J., delivered the opinion of the court.

In June, 1854, James G. Randle, the appellee, was appointed guardian of Susan J. McFarlane, a minor. In October, 1854, March, 1855, and March, 1856, he reported the receipt of several sums of money belonging to his ward. The report of March, 1856, showed the receipt of $1,200, in January of that year, which is stated to have been loaned at interest at ten per cent. on notes with approved security, except so much thereof as had been expended by the guardian for his ward. In June, 1855, he settled his first annual account, in which he charged himself with the sums of money previously received, amounting to $3,600, with interest from the date of the receipt to the date of the account, and showing " a balance on hand " of $3,668.20.

In his second account, filed June, 1856, he charges himself with the " amount on hand " as appeared by his former account, and also with the sum of $1,200, received as aforesaid in January, 1856, and with three other sums, amounting in the aggregate to $1,550, received in April and May, 1856, and charges himself with interest on each sum from the date of its receipt up to the date of the account.

He continued every year, up to and including the year 1864, to present similar accounts, in all of which he charged himself with the balance on hand at the previous settlement, and struck a new balance on every account as on hand, due to his ward. In all these accounts he charged himself with the whole amount of the money he had received for his ward, and in all, except those of 1863 and 1864, he charged himself with interest on the whole amount from the date of the last account to the date of the next. The balances on all these accounts were charged in dollars and cents, and were so approved and adjudged by the Probate Court. The interest was charged as upon money on hand. No order appears to have been made directing the loan-

ing of any of the money of the ward, and there is nothing in all this long period of time to show that any of her money was actually loaned out by the guardian, except the report made in March, 1856, which stated that the sum then reported ($1,200) was loaned at interest on approved security. But even this sum was reported in his next, and all subsequent accounts, as being on hand in the same manner as the rest of the fund.

In October, 1863, the guardian presented a petition to the Probate Court, stating that as such guardian he had a large amount of money, say $7,000, on hand, and after energetic action he had not been able to loan the same out, as there was no demand for money, and he was unwilling to take it himself and pay interest on it. That owing to the disturbed state of the country he thought it would be unsafe to invest his ward's estate. That he had had the money all of that year, and knew of no chance to loan it out, although he had made repeated exertions to do so. And he prayed for an order permitting him to hold said money without interest, until he could have an opportunity to loan the same at interest.

This petition was continued from term to term until January term, 1864, when the court made an order thereon that the guardian be permitted to hold the money then in his hands, belonging to his ward, until he could have an opportunity of loaning the same into good hands at interest.

In August, 1865, the guardian presented his eleventh annual account, in which he charged himself as follows, to wit:

"To balance due as per last annual report, received previous from different parties in Confederate money . . . . . . . . . . . . . . . . $5,729 96

"Said balance consisted of five coupon bonds of the Confederate States of America, bearing seven and eight per cent. interest per annum, payable semi-annually, for $1,000 each, dated January 8, 1865, and payable to bearer on the 1st of January, 1873. Signed, R. O. Tyler, and of the Nos. following, to wit: 943, 944, 945, 946, 981 . . . . . $5,729 96."

After deducting disbursements, this account exhibited a bal-

McFarlane *v.* Randle.

ance in favor of the ward of $4,939.46, which is stated as the "balance due estate of ward," invested, as stated, in eight per cent. Confederate bonds.

To this account the ward, by her next friend, filed several exceptions, of which it is only necessary to notice the sixth. This exception insisted that the guardian was concluded by his previous reports, and the action of the Probate Court thereupon, and was bound to account for the estate as lawful money of the United States, and that he had no legal authority to convert the same into Confederate bonds.

This exception was overruled by the court, and from this decree the present writ of error is prosecuted.

On the trial of the exceptions, the exceptant introduced and relied on the entire records of the court in the matter of said guardianship.

The accountant was examined as a witness in his own behalf, and testified, in substance, that he never used the ward's money for his own purposes, nor allowed it to become mingled with his own; that he kept it lent out as much as possible, and informally exhibited the notes, or other evidences of debt, to the Probate judge for his approval, which was given in writing upon the notes. That at the commencement of the war, in 1861, her money was all lent out to solvent persons, though the best of them are now of doubtful solvency, and many hopelessly broken. That in 1861 money matters were very tight, and collections could not be made to meet his ward's necessary expenses. That in 1862, Confederate treasury notes, cotton notes, &c., were issued, which made money matters more easy. That during 1862, all, or nearly all, the ward's money was paid to him in Confederate treasury notes, which he received "in due course of business," to wit, as collections from those to whom he had previously lent. That he received them as so much money, as he and all other prudent men did for themselves individually—this currency being then regarded as a safer investment than individual security, or any kind of property, especially in the section of country in which the money was lent, which was threatened with raids by the enemy, and the military

were ordered to burn all cotton in danger of falling into the enemy's hands.

That after he had thus collected all ward's money in Confederate States treasury notes, all his subsequent annual settlements charging him with " money," should have designated it as Confederate States treasury notes instead of money, but this was omitted by oversight and mistake of himself and counsel.

That having thus received ward's money in Confederate States treasury notes, it was so plentiful in the country that he could not re-lend it, and after repeated and diligent efforts to do so, during the years 1862 and 1863, he obtained permission of the Probate Court, at January term, 1864, to retain the same without interest. That the value of the treasury notes as compared with coin, was as follows, progressively downwards, to wit: in 1862, from 20 per cent. discount to three dollars for one; in 1863 from three to twenty-one dollars for one; and in 1864 from twenty-one to fifty-one dollars for one.

That in 1864, at the earnest solicitation of ward's mother, by the verbal advice of the Probate judge, and on consultation with prudent and sagacious men, he consented to invest ward's treasury notes in Confederate bonds, but could not then do so at a less rate than seventeen per cent. premium for the bonds. That with his own cotton he purchased $7000 worth of bonds (the same specified in this account), and gave them to ward at par, he retaining her $7,000 of treasury notes, which are yet in his possession. That in receiving the notes, and investing them in bonds, he acted precisely as he did for himself. He received all debts, and the price of all produce sold during the war in that medium, and had large amounts of notes and bonds on hand at the close of the war. That in so doing, he did what the most prudent and sagacious men in the country did, and honestly believed it was best for his ward.

The competency of this testimony was all objected to at the time, on appropriate grounds stated in the record, and exceptions were taken to its admission by the court.

On cross-examination, the witness stated he did not invest his own entire estate in Confederate notes or bonds, but only

McFarlane *v.* Randle.

his surplus means, and that he had a large estate not so invested.

Accountant also introduced witnesses who testified that the conversion of the treasury notes into bonds, at the time it was done by accountant, was a good investment of the former, and the most prudent, practicable use to be made of them. That they had done the same, and had also received Confederate States treasury notes for their good debts.

Accountant then produced two other bonds of $1,000 each, and testified that he had bought them for the ward at the same time with the others, and then tendered them to the ward, who declined to receive them, and objected to their admissibility alike with the others.

The case was submitted on the foregoing testimony.

Under the circumstances disclosed by the record, we think the court below erred in admitting the testimony of the accountant, to explain and disprove his settlements of his accounts in 1862, 1863, and 1864, and his sworn petition filed in October, 1863, by showing that the money in his hands according to these accounts, and this petition, was not money, but consisted of treasury notes of the Confederate States of America, received by him in payment of debts due to his ward, and afterwards converted by him some time during the year 1865 into bonds issued by the same government.

By his annual account presented at July term, 1862, the accountant charged himself as follows: " 1861, June 1, to amount due on last annual account, $7,795.82; interest on same to July 1, 1862, $675.63 ; " and after deducting disbursements, strikes a balance against himself of $7,677.38; which account was examined and allowed, and ordered to be recorded.

At September term, 1863, he presented another account, which is entitled " a true statement of his actions in full touching premises in the said guardianship for the year 1862-3, commencing and running from the July term, 1862, to the present time." In this account he charges himself, " 1863, July 10, to balance due her on last annual account for 1862, $7,677.38,"

and after deducting disbursements, he states a "balance due" of $7,176.32; and adds at the foot: "The foregoing is a true statement of the annual account and report, and your said applicant respectfully submits the same to the court now sitting, &c." This account was also examined, approved, and ordered to record.

At July term, 1864, another account was presented, with a similar caption to the last, in which the accountant charged himself as of July 4, 1864, with "balance due as per last annual account for 1862" (should be 1863), $7,176.32, and after deducting disbursements, strikes a "balance due" of $5,729.96, and concludes as the account of the previous year, and this also was approved and recorded.

The petition filed in October, 1863, states that he has a large amount of money, say $7,000, on hand, which he is unable to loan out, and which, in the disturbed condition of the country, he thinks it would be unsafe to invest; that he has had said money on hand all the year, and prays to be permitted to keep it without paying interest. And upon this petition he obtains the order of the court at January term, 1864, permitting him to hold the money then in his hands, belonging to his ward, until he could have an opportunity of loaning out the same into good hands at interest.

During all these proceedings there is not a single hint that he had received the depreciated issues of the Confederate government in payment of the entire estate of his ward, but all the proceedings speaks of money, and the accounts and reports are made out in dollars and cents, which can only mean the constitutional currency of the country. Indeed the proceedings themselves seem to be inconsistent with the idea of any other basis than actual money, for it is inconceivable that an intelligent gentleman, and an enlightened court, could have thought it unsafe in January, 1864, to invest Confederate treasury notes in property in consequence of the disturbed condition of the country, when these notes were already at a depreciation of twenty-one dollars for one in coin, and were "progressing downwards" with startling rapidity. But however that may

McFarlane *v.* Randle.

be, it is clear that the settlement of the accounts referred to after the time of the alleged conversion of the ward's estate into Confederate notes, must be held to be binding and conclusive on the accountant, and not liable to be explained or contradicted by parol testimony. If at the time of the presentation of these accounts, and of the petition before quoted, the money originally received by the guardian had been changed into this new form, it was the duty of the guardian to have promptly reported the facts to the court, and to have conformed his future proceedings in the court to the new attitude of the case. His continuance to make his reports in precisely the same form as he had done from the time of the original receipt of the money, was equivalent to a report that the condition of the fund remained unchanged. Had he made known the facts at the proper time, the court could have determined, upon the facts and the law as they then stood, whether he was justifiable in receiving this sort of funds in payment of debts due to his ward, and if so, could have directed what disposition should be made of them. But nothing is heard on the subject until August, 1865, after the Confederate government had ceased to exist, and its obligations had become utterly worthless—when, for the first time, it is proposed to wipe out the whole estate of the ward by substituting for it these bonds, of no value whatever. It would be establishing a precedent of most dangerous tendency to allow this to be done, and would open wide the door for the commission of frauds upon the rights of the widow and the orphan.

The idea is as much opposed to established legal principles as it is against sound policy. Besides the admitted general principle that no written instrument, including records, can be explained or contradicted by parol evidence, the very question involved here has been adjudicated in this court. In *Bailey* v. *Dilworth*, 10 S. & M. 404, a final account of an executor ascertaining a balance against him in dollars and cents was held to be conclusive evidence of a debt in constitutional currency, and not liable to be impeached or contradicted by proof that the money collected by the executor was in the depreciated issues of

suspended or broken banks.   And it is also said to be the duty of the executor to disclose the true state of facts to the Probate Court, by which tribunal such allowances might have been made as the circumstances warranted.  The same rule as to the conclusiveness of the settlement is applied to the annual accounts of guardians, which are final against him, in the court where rendered, and can only be set aside by due course of procedure.  *Johnson* v. *Miller,* 33 Miss. 553.   It is not necessary to say that this rule, in its application to annual settlements, must be held to apply, with undeviating strictness, in all cases and under all circumstances; for corrections of such accounts have been allowed under certain circumstances.  *Effinger* v. *Richards,* 35 Miss. 540, *Crump* v. *Geroch,* MS., not reported.  If we admit that inaccuracies in such accounts, arising from sheer inadvertence or oversight, or from palpable mistake or miscalculation, may, in proper cases, be corrected, the present case cannot be regarded as forming an exception to the general rule.   The failure to report the facts until the lapse of three years, and until the circumstances of the country had wholly changed, and the securities received had become utterly worthless, and the continuance to report the condition of the estate year after year, as though the change had taken place, cannot be put in the category of inadvertence or oversight.   It is a failure to discharge a duty incumbent on the guardian, and the plea of forgetfulness or oversight cannot entitle him to relief against its consequences..  We are therefore of opinion that the court below erred in overruling the sixth exception of the plaintiff in error, to the eleventh account of the defendant in error, and that the same ought to have been sustained, and the guardian required to account for the estate received by him, in legal currency.

The first five exceptions were sustained, and the guardian ordered to alter and correct his account accordingly; and the plaintiff in error asks for a reversal of this part of the decree on the ground that it does not go farther, and make the proper corrections in the account.   But this was unnecessary.   The decree does order the corrections; and if the accountant does not comply with the order, it will be the duty of the court to cause

the account to be restated according to the decree, by reference
to a commissioner, or otherwise in conformity with the usual
practice of the court.

The decree of the court, overruling the sixth exception, will
be reversed, and the cause remanded for further proceedings in
accordance with this opinion.

This case is submitted with the foregoing, and a similar judg-
ment will be entered, the facts and principles of the cases being
the same, except as to names and sums.

The decree of the court below overruling the *fifth* exception,
is reversed, and the cause remanded for further proceedings in
accordance with the foregoing opinions in No. 10,368.