## J. B. ROGERS et al., Adm'rs, vs. C. J. TULLOS.

1. CONFEDERATE MONEY: *Contracts and judgments to pay " dollars and cents." Parol evidence, when admissible to show what currency contem-plated. Administrators' accounts.*

   A contract to pay " dollars and cents " means payment in the lawful cur-rency of the United States, and parol evidence is inadmissible to show an intent to pay in a different currency. This rule is only applicable to citizens of states maintaining their constitutional relations to the union. It does not apply between citizens of a state, whose relations with the government, at the time of the contract, were suspended, and whose law (for the time, supreme and exclusive) recognized another and different currency. Contracts between citizens of the confederacy, dur-ing its existence, to pay " dollars and cents," may, by parol evidence, be shown to have intended confederate money. This rule as to contracts should be extended and is applicable to judgments and orders of con-firmation of reports rendered by the courts of the insurgent states, dur-ing that period. An order of the probate court confirming an annual account of an administrator, made during the war, does not preclude him from showing that " dollars and cents," reported as received by him, were in fact depreciated confederate money; but proceeds of sales made in December, 1861, should not be accounted for in depreciated currency.

2. ADMINISTRATOR: *Liability for receiving depreciated currency.*

   An administrator will not be permitted to show that the money received by him was in depreciated funds, if he received other than the currency prescribed by the prevailing law.

3. SAME: *When liable for interest. Commingling estate and private funds.*

   An administrator is chargeable with interest if he uses the money of the estate or commingles it with his own funds.

4. SAME: SAME: *Payment of debts.*

Where the administrator held depreciated currency, it was his duty, in good faith, to use the same in the payment of debts of his intestate and the expenses of the administration, if it was possible to do so, and if he failed in this duty, the loss should fall on him, as a consequence of such negligence.

APPEAL from the Chancery Court of *Smith* County.

Hon. T. B. GOWAN, Chancellor.

The appellants were appointed jointly as the administrators *de bonis non* of the estate of Wm. H. Brown, who died intestate in 1859. They procured an order of the probate court in November, 1861, directing them to sell certain personalty belonging to said estate. They proceeded to sell, and made report of sales in December, 1861, amounting to $1,514.81. They report that "the purchasers gave notes with good and approved security." Another sale was made in 1862 of only $13.15. They presented their first annual account in April, 1863, reporting divers sums collected, $785.62; amount paid out on debts, $412.46; balance due estate, $373.16. They reported in second annual account, March, 1864, receipts of $983.58, and hire of slaves (notes taken) $526; paid out $417.87; next annual account, 1867, charges, receipts, $115; next, in 1868, receipt, $50, paid out, $2.88.

In November, 1869, they reported dealings as follows:

| | |
|---|---:|
| In confederate money, received | $2,290 20 |
| In confederate money, paid out | 830 33 |
| In confederate money, balance | $1,459 87 |
| In United States currency, received | $303 00 |
| In United States currency, paid out | 39 38 |
| In United States currency, balance | $263 62 |

This was ratified as a final account, but was regarded as void for want of notice. The chancery court, in 1870, ordered them to render a final account. The account was presented, exceptions were filed:

1. The administrators having charged themselves with dollars and cents, their transactions must be held to have been in United States currency, and that they cannot now be permitted to show them to have been in confederate money.

2. That items were allowed without proper vouchers.

3. That a number of bales of cotton belonging to the estate were sold by the administrators and not accounted for.

4. That the administrators in fact mingled the funds of the estate with their individual funds.

The court rendered a final decree against the administrators for $1,131.59, from which decree they prosecute this appeal, and assign for error, the following:

1. That the court below overruled the plea of said appellant, J. B. Rogers to the petition of the appellees filed at October term, 1870.

2. That said court erred in ordering and decreeing that said appellants should render another final account and settlement after said administrators had made their final account and had been discharged as administrators at the November term, 1869.

3. That said court erred in ordering and decreeing that said administrators should be accountable for the funds received by them in confederate money, and be charged therewith as good money.

4. That the said court erred in rejecting the evidence offered by appellants to show that the funds received by them were collected in confederate money, and in good faith.

5. That said court erred in sustaining the exceptions taken by appellees to the account of said administrators, rendered at the April term, 1871, and also in ruling the final term against said appellants at the April term, 1872.

*A. H. Handy*, for appellants:

The decree confirming the first final account was conclusive. It recites all the jurisdictional facts. Cason *v.* Cason, 31 Miss., 578, 593, 595; Pollock *v.* Buie, 43 id., 140, 150, 151; 7 How. (Miss.), 188. The account must be taken as having been duly

allowed and confirmed, and cannot again be called in question.
The parties having received their share of the estate cannot object
except on the ground of ignorance, surprise or fraud ; then only
by bill of review, and this was not a bill of review.   Story on
Eq. Plead., § 403.   There was error in the exclusion of the testi-
mony, and in the decree.   Williams *v.* Williams, 43 Miss., 430,
436; id., 102 ; id., 207.   Confederate money was made payable
by law for public dues.   Acts of 1861, ch. 12.   Executors, ad-
ministrators and guardians were authorized to invest in it.   Acts
of 1861, ch. 11.   By acts of 1865, ch. 11, §§ 4, 5, and acts of
1864, ch. 8, they are only chargeable with its actual value.

*A. J. McLaurin* and *J. A. Brown*, for appellees:

The notes taken by the administrator were payable in gold.
There was then, no confederate money in Mississippi.   Gold was
the circulating medium.   The property was sold at gold prices;
the sale was confirmed on a gold basis.   After May 1, 1862, all
contracts were *prima facie* in confederate money.   Acts of 1866–7,
pp. 373, 374.   Two annual accounts were filed in 1863–4, show-
ing proceeds of sales, $1,769.20.   If he had reported it in confed-
erate money, an investment could have been ordered ; but as he
did not, the court must have inferred that it was in gold.   Noth-
ing is heard of it until 1869.   The restated final account charges
them with the amount in United States currency, $1,131.59.   The
decree is, *prima facie,* correct.   See Bailey *v.* Dilworth, 10 S. & M.,
409 ; Johnson *v.* Miller, 4 George, 558 ; McFarlane *v.* Randle, 41
Miss., 426 ; Coffin *v.* Bramlitt, 42 id., 194; Ferguson *v.* Lowry,
Cent. Law Journal, Aug. 20, 1875 ; Horn *v.* Lockhart, Leg. Gaz.,
March 6, 1864; Williams *v.* Williams, 43 Miss., 436.

TARBELL, J., delivered the opinion of the court.

The question for determination in this case is, as to the right to
show by parol that the term "dollars," used in the annual and
final accounts of administrators and guardians, during the late
confederacy, means other than the constitutional currency of the
United States.

Wm. H. Brown deceased in 1859. In 1861, J. B. Rogers and T. B. Rogers were appointed administrators *de bonis non* of the estate of the deceased. In November, 1861, these administrators were directed by the probate court to sell certain of the personal property belonging to the estate, on a credit of twelve months.

They reported the sale as having taken place December 13, 1861. Reference is made in their report to an exhibit, or account of sales, filed therewith, by which it appears that the aggregate amounted to $1,514.81. And the report says: "We, as administrators, further report that all of said purchasers have given notes, with good and approved security for the payment of the sums bid by them respectively for said personal estate."

Another sale was made January 6, 1862, of refuse articles, aggregating $15.15.

The first annual account of these administrators was rendered in April, 1863, wherein they charge themselves with the receipt, on account of the estate, of divers sums from different persons, up to January 6, 1863, amounting to $785.62, and that they had paid debts to the amount of $412.46; leaving a balance in their hands belonging to the estate of $373.16.

A second annual account was rendered in March, 1864, stating the receipt of $983.58, and at the same time the administrators reported the hiring of slaves for 1864, and notes taken, with good and sufficient security, payable on or before January 1, 1865, which hire amounted to $526.

At the same time the sum of $417.87 was reported as paid out.

The next account was made in 1867, when the administrators charge themselves with the receipt of $115.

In 1868, the receipt of $50 is acknowledged, and $2.88 charged as paid out.

At the November term, 1869, of the probate court, the petition of the administrators set forth their dealings in United States and confederate currency respectively:

| | | |
|---|---:|---:|
| In confederate money, received.................................. | $2,290 | 20 |
| In confederate money, paid out.................................. | 830 | 33 |
| In confederate money, balance................................. | $1,459 | 87 |

| | | |
|---|---:|---:|
| In United States currency, received.............................. | $303 | 00 |
| In United States currency, paid out. ............................ | 39 | 38 |
| In United States currency, balance............................. | $263 | 62 |

This statement was ratified and confirmed as the final account of the administrators, and they were permitted to surrender their trust; but this was without notice to the heirs and distributees of the estate, and void.

In 1870, a term of the chancery court, under the present system, was held in Smith county, when the heirs and distributees presented to the chancellor a petition in writing, praying an order that the administrators render a final account. It was ordered accordingly, and the administrators stated their transactions in detail. Time was given to file objections and exceptions to the account. These were filed, and claim, in substance: 1. That the administrators, having rendered their accounts in dollars and cents, their transactions must be held to have been in United States currency, and that they cannot now be permitted to show them to have been in confederate money. 2. That items were allowed without proper vouchers. 3. That a certain number of bales of cotton, belonging to the estate, were sold by the administrators, and not accounted for; and 4. That the administrators, in fact, mingled the funds of the estate with their individual funds.

Such further proceedings were had in the chancery court that a final decree was rendered, declaring the administrators indebted to the estate in the sum of $1,131.59, and the sum was ordered to be distributed in the sums and to the parties specified in the final decree. From this decree the administrators appeal to this court. Various grounds of error are assigned, not necessary to be stated or discussed in detail.

Referring to actual dates of transactions, it is evident that the sales of personal property in December, 1861, and January, 1862,

and the notes taken, were upon a gold basis. It is also manifest that the transactions of hiring out slaves in 1863–4, were on the basis of confederate currency. The debts discharged in those years might also have been paid in the currency of the times; as to which, there is no evidence. In 1867–8, the lawful currency of the United States was restored, and confederate currency excluded. Do these different periods through which the estate was conducted afford any aid in the solution of this case?

In McFarlane v. Randle, 41 Miss., 411, the transactions commenced in 1854, and were continued to 1865. There were eleven annual accounts, all reciting the sums in the hands of the guardian as in "dollars and cents," without designating the character of the currency. Lawful money of the United States was exchanged for confederate treasury notes without the authority of the court. After the war, the guardian sought to account to his ward in the funds of the then defunct confederacy: *Held*, he was concluded by his settlements.

The transactions in Coffin v. Bramlitt, 42 Miss., 194, commenced in 1859. The court say: "Upon the settlement of the sixth annual account, in the month of March, 1864, the guardian held his ward's money to the amount of $758.46, in par funds. He has so charged himself in that account, and he is not allowed to gainsay it." This question is then propounded by the court in that case: "Had the guardian a right to invest his ward's money in confederate treasury notes or in confederate bonds, without the authority of the probate court?" To this question a negative answer is given. In discussing this question, however, the court say: "If a guardian, acting in good faith, and with a due regard to the interests of his ward, should receive, in the usual course of business, paper money, the circulating medium at the time, which should afterwards depreciate, or become worthless in his hands, he would not be chargeable with the loss. It is a general rule, applicable to all persons standing in the relation of trustee, whether they be receivers, guardians, executors or administrators, or trustees of any description, that so long as they keep themselves

strictly within the line of duty, and exercise reasonable care and diligence, they cannot be made responsible for any loss or depreciation in the fund entrusted to them; but if they do not strictly pursue that line, and a loss ensue, they are liable to make that loss good, although such loss may have been wholly unexpected."

To what state of case would these rules, thus clearly stated, apply? Can they apply to any case, unless, under circumstances, an administrator shall be allowed to prove that the amount reported by him in dollars and cents is, in fact, due in the depreciated currency referred to? If this question shall be answered in the affirmative, then under what circumstances would such proof be admitted, within the rules quoted?

Chief Justice CHASE, in Thorington v. Smith, uses the following language: "It is quite clear that a contract to pay dollars, made between citizens of any state of the union, while maintaining its constitutional relations with the national government, is a contract to pay lawful money of the United States, and cannot be modified or explained by parol evidence. But it is equally clear, if in any other country coins and notes denominated dollars should be authorized of different value from the coins or notes which are current here under that name, that, in a suit upon a contract to pay dollars made in that country, evidence would be admitted to prove what kind of dollars were intended, and if it should turn out that foreign dollars were meant, to prove their equivalent value in lawful money of the United States. Such evidence does not modify or alter the contract. It simply explains an ambiguity, which, under the general rules of evidence, may be removed by parol evidence."

And if a contract, why may not a foreign judgment, sued upon here, be explained in the same way? If the judgments of France, whose accounts are kept in francs and decimes, or of England, whose currency is reckoned in pounds, shillings and pence, were the basis of suits here, of necessity, evidence would be admissible to determine their equivalent values in our currency. And if the judgments and contracts of foreign countries may be thus ex-

plained, why not the judgments and obligations, as well as the contracts of the late confederacy? The insurgent states, while in rebellion, were quite as " foreign " to the union as any that can be named.

The facts in Williams *v.* Campbell, 46 Miss., 57, were materially different from any of the foregoing. Williams was appointed administrator of the estate of Brooks, deceased, in November, 1862, and at the same term of the probate court, the administrator was ordered to sell the perishable property of the decedent on a credit. The sale took place accordingly in 1863, for confederate money, which was bonded in 1864. No report was made or account filed until December, 1865. Upon the theory that the administrator had acted in good faith, he was allowed to account for the confederate money in its equivalent value at the date of its receipt. But suppose the administrator to have made his report of the sale, which had been confirmed as his annual account and ordered of record. Indeed, the law required this. If he had rendered an annual account, he would have been in the strict line of his duty. In such case, would he have been estopped from showing his transactions to have been in confederate money? Would it be holding the scales of justice evenly balanced to declare in one case as really the result of a neglect of official and statutory duty, that the party might account for his transactions in confederate money, while as to the other, who filed his annual account, as in duty and law he was required to do, that he should account in lawful or par funds, though in fact he had received only the depreciated currency of the war; yet in good faith, in the usual course of business, and in obedience to the orders of the probate court?

The only difference in the two cases would be this, that in one the administrator omitted to make and file an annual account, and in the other an annual account was made and approved. Suppose a citizen to have purchased, in 1863–4, a pair of boots, for which he gave his note for $150, and a horse for $2,500, for which he also gave his note, and that during the confederacy these

notes were reduced to judgment, reciting on its face that it was for $2,650. Suppose further, that this judgment not having been satisfied during the war, it is now sought to enforce it for its face in the currency of the present day. Would not gross injustice be done, unless the true value of that judgment could be shown? To admit parol evidence of the value of the boots and the horse, ·or that the "dollars" and "cents" recited in the judgment meant confederate money, would not invalidate the judgment; it would not be an attempt to impeach its verity by parol; it would not be an attempt to attack its binding force, either as to its lien ·or its validity as a judgment; but it would be merely the application to judgments of the rule applied to contracts, during the existence of the confederacy, and upon the principles enunciated in Thorington v. Smith, *supra*, and other cases on the subject.

It is not perceived why the rule should apply to contracts and not to judgments for the same period. The contracts and judgments referred to were within a strange, alien, and essentially a foreign jurisdiction, in many respects. An illegal, usurped, revolutionary jurisdiction, it might have been, and was; nevertheless, for many purposes, and with some exceptions, its laws are enforced by the rightful government, as are contracts between its citizens, and the judgments and decrees of its courts.

For the time, this illegal, alien, usurping government, or jurisdiction, was supreme. It created, promulgated and enforced a currency of its own. In the enforcement of the contracts of citizens of the confederacy, the restored government permits the lawful equivalent of the currency therein expressed, to be shown by parol. Can justice be done without allowing the same principle to apply to the judgments of that jurisdiction? Pending the rebellion, "money" meant what was made so by legislation, enforced by the power of the insurgent states. The authority and the currency of the United States were excluded by force. In Thorington v. Smith, it was held, that under the insurgent government, the word "dollar" did not, during the period of its existence, have the same meaning as under the government of the

United States, but that it must be taken to mean such dollar or money as was established as a circulating medium by the insurgent government.

In permitting this difference to be explained by parol, the rule in Bailey v. Dilworth, 10 S. & M., 404, is not invaded. It was held in that case, that an account by an administrator reporting a sum certain, in dollars and cents, due from him, is conclusive that it was due in constitutional currency, and that it could not be shown to be due in depreciated bank notes. The decision was unquestionably sound, but not applicable to confederate or foreign transactions. The reception of depreciated bank paper by agents, and all others acting in a fiduciary capacity, whether as agents, sheriffs, or trustees of any description, in payment of debts, was unauthorized. The adjudication was by the courts of the rightful and lawful government then supreme, with reference to transactions within that jurisdiction. By the law of the land, dollars meant the lawful, constitutional currency of the United States. Under the confederacy, dollars had another and a different signification and value. Proof, in the case cited, that the amount reported by the administrator was due in depreciated currency, would have had the effect to vary a written contract by parol; to change the obligation of an agent or trustee; and it would not only have changed, but have impaired the obligation of the contract.

These observations apply to the cases of Miller v. Johnson, 33 Miss., 553; Effinger v. Richards, 35 id., 540; and Crump v. Gerock, 40 id., 765. They were decided correctly, with reference to the supreme law and currency then prevailing, and to the time, circumstances and jurisdiction of the transactions. The remark is repeated, that under the United States a dollar has a distinct, legal, constitutional, known value, but under the confederacy it had another and different meaning and value. The propriety and justice of permitting this difference to be shown by parol, as well in case of judgments and all legal documents, including judicially approved and recorded reports and accounts of administra-

tors, is all that is contended for. In the cases of McFarlane v. Randle, and Coffin v. Bramlitt, the guardians had received for their wards the constitutional currency of the United States. It was, therefore, correctly held, that they could not be allowed to show that their indebtedness to their wards was due in depreciated currency. Good money had been exchanged for bad, through the want of foresight and judgment of the guardians, and without authority of law, and their obligations could not be discharged in that way. So far as applicable to the facts, to the reception of par funds in the lawful currency of the rightful government, during the existence of the latter, and the circulation of its money, the doctrine was correctly announced, as to the incompetency of parol evidence to explain, or contradict, or vary the terms of a written instrument or the statement in an administrator's account, by way of showing, as in those cases, that the sum reported due from them in money meant anything else than the money of the United States. This was right, on the facts, because applicable to the money received, the government existing when received, and the rules regulating the transaction at the time. The subsequent exchange by the guardians of the lawful for the unlawful and worthless money was their fault, which they could not be suffered to plead in excuse.

It is axiomatic that all rules of law cease with the reasons of them, and when it is shown that the currency is changed by law, or, when a contract or obligation has reference to a currency other than the currency of the country where or time when such contract or obligation is sought to be enforced, the meaning of the term dollars, or other term expresssing the value or currency of the contract or obligation, must be interpreted by the rule as changed, or by the meaning of the term as used at the time and place of the contract or obligation. "It is quite clear," says Chief Justice Chase, "that a contract to pay dollars, made between citizens of any state of the union, while maintaining its constitutional relations with the national government, is a contract to pay lawful money of the United States, and cannot be modified or ex-

plained by parol evidence." This is believed to be the limit of the doctrine in that direction, of the cases of McFarlane *v.* Randle, and Coffin *v.* Bramlitt.

The further remarks of the learned jurist just cited, following the paragraph last quoted, with reference to foreign contracts and the evidence by which, in a suit on them here, the equivalent values of currency may be determined, are adopted as developing the principle by which the question under consideration ought to be solved. There are on the one hand, the government of the United States, her laws, her currency, her courts, and her rules for the construction of contracts, obligations, and transactions in her currency within her jurisdiction. On the other hand, are the Confederate States, illegal as they were, yet supreme and exclusive for the time, their laws, currency, and courts, for all the purposes of this discussion, foreign to the United States. And this suggests to the view now attempted to be presented, to-wit, simply that the rules applied to contracts between citizens of the insurgent states, during the rebellion, shall be applied to the judgments and other legal obligations involving the payment of money, between the same citizens, for the same period, and within the same territory.

In the case at bar, the first exception of the appellees was to an item of $22.42 in the final account of the administrator as paid to Thomas McLean, for which no voucher was filed. This was withdrawn.

The second exception was to an item of $346.77, paid school commissioners without a voucher. This was also withdrawn.

The third exception to an item of $59 was sustained and confessed by the administrators.

The fourth exception was based on a mistake, which was corrected by mutual consent.

The fifth exception objected to proof of confederate money transactions by the administrators, and was sustained.

The sixth exception was to the same effect, and sustained.

The seventh exception the same, and sustained.

The eighth exception is specifically to the report of the administrators, that they had made the sale of personal property in December, 1861, for confederate money, when, in fact, they reported such sale at the time in dollars and cents.

The ninth is a like exception to an item of $13.15, for sales in January, 1862.   Sustained.

The tenth exception is to the report of the receipt of confederate money for hire of slaves in 1862-3-4, which was sustained.

The eleventh exception is to the effect that the administrators sold eight bales of cotton for a large price, and had rendered no account thereof.   This was not decided.

The twelfth exception charges that the administrators mingled the funds of the estate with their individual funds, without charging themselves with interest.   This was not decided.

The thirteenth and last exception is to the effect that the final account is not made up of, nor does it contain, a statement of the balances of the accounts as required by the statute.

The final decree pretermits all reference to the charge that the administrators had not accounted for a quantity of cotton sold, and it also ignores the charge of mingling funds.   In restating the account of the administrators, the court assumed all the transactions of the administrators to have been in the currency of the United States.   The several balances reported in their annual accounts were then brought together, and the aggregate, after deducting commissions allowed the administrators, was decreed to be the balance due the estate from them.   From this decree the administrators appealed.

It is believed the final decree should have proceeded upon the following basis :

1. The administrators should account for the proceeds of the sales of personal property in December, 1861, and January, 1862, in the currency of the United States.   Those sales were on a gold basis.   They could have been on no other.   There was at that date no confederate currency.   And besides, as a general rule, calculations of confederate currency do not begin until May 1, 1862.   Laws of 1867, approved February 19, 1867, p. 373.

2. The hiring of slaves in 1862–3–4, was manifestly with reference to confederate money.

3. It does not appear in what currency debts were paid. This should be inquired into and adjusted accordingly.

4. Receipts after the war were of course in United States currency·

5. There was some evidence of the sale of cotton by the administrators unaccounted for by them. This should be further investigated, and a decree according to the facts.

6. The record, as it is now presented, shows the administrators to have loaned the funds of the estate to their friends and neighbors, at a liberal interest, and to have substantially mingled the funds of the estate with their individual funds. This should be further investigated, and the administrators charged with the interest, if justified by the facts.

In addition to the foregoing suggestions, it ought, perhaps, to be added, that it was the duty of the administrators to pay the debts of the estate, and, if in their power, to use the depreciated money in their hands for that purpose. Good faith required an effort on their part to do this. If they neglected or failed in their duty in this respect, the loss should fall upon them.

In view of these suggestions, the decree is reversed and cause remanded for further proceedings, in accordance with the rules stated herein. *Vide* 10 S. & M., 404; 33 Miss., 553; 35 id., 540; 40 id., 765; 41 id., 411; 46 id., 57; 5 S. & M., 422; Laws of 1865, p. 143, sec. 4.

SIMRALL, J., concurs.

PEYTON, C. J., dissents.